COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss

SUPERIOR COURT
CIVIL ACTION

| | |
|---|---|
| CARL ZEISS MEDITEC, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| WILLIAM SHIELDS, | ) |
| | ) |
| Defendant. | ) |

07-2453

C.A. NO. _____-BLS

## VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF, BREACH OF CONTRACT, BREACH OF FIDUCIARY DUTY, UNFAIR COMPETITION AND DECLARATORY JUDGMENT

For its Verified Complaint for Injunctive Relief, Breach of Contract, Breach of Fiduciary Duty, Unfair Competition and Declaratory Judgment against defendant William Shields, plaintiff Carl Zeiss Meditec, Inc. ("CZM") avers as follows:

### NATURE OF THE ACTION

1.     This action is brought to enforce the post-employment non-disclosure covenants contained in the Employee Agreement between CZM and one of its most senior sales and managerial employees, defendant William Shields. A copy of Mr. Shields's Employee Agreement ("Employee Agreement") is annexed hereto as Exhibit A. As CZM's former Sales Director Europe, Mr. Shields was responsible for developing, overseeing and managing CZM's business and sales plans in Europe, the Middle East and Africa ("EMEA"). Mr. Shields also helped create and had access to CZM's trade secrets and highly confidential business information. Mr. Shields recently left CZM to take an apparently identical sales and management position with Optovue, Inc. ("Optovue"), a CZM direct competitor. Just prior to his

10602282.4

**EXHIBIT 1**

- 2 -

departure, Mr. Shields requested and received copies of CZM's European marketing and sales plan for its latest product: the Cirrus HD-OCT, that will compete directly with Optovue's only product. This information contained a list of key thought leaders and sites where CZM's new product would be introduced, incentive pricing information and roll-out plans. Disclosure of this information to competitors, especially Optovue, would undoubtedly result in severe economic consequences and irreparable harm to CZM's business reputation. CZM has also recently learned, based on a forensic analysis of Mr. Shields' CZM-provided laptop computer, that he secretly forwarded certain CZM confidential information to Optovue and failed to return certain media that likely contains CZM confidential information. He is thus in a position to unlawfully use CZM's confidential business information that he has already gathered and sent to Optovue in direct competition with CZM, develop business plans that are directly competitive with those he created for CZM and to interfere with CZM's customer goodwill. Indeed, such unlawful conduct is inevitable.

2.    By this action, CZM seeks, among other things, a preliminary and permanent injunction: (1) prohibiting Mr. Shields from performing services for Optovue in the small, niche market in which CZM and Optovue compete, for a period of two years from the date he last received compensation from CZM; (2) requiring Mr. Shields to return to CZM all CZM trade secrets and confidential information in Mr. Shield's possession, custody or control; and (3) using, relying upon or transmitting to others any CZM trade secrets and/or confidential information. This narrow restraint is necessary to protect CZM from the irreparable harm it will suffer if Mr. Shields is allowed to unfairly compete directly with it.

- 3 -

## FACTUAL BACKGROUND

### The Parties, Jurisdiction and Venue

#### Carl Zeiss Meditec, Inc.

3.      CZM is a New York corporation with its principal place of business in Dublin,

California.  CZM is a subsidiary of Carl Zeiss Meditec AG.

4.      CZM is an integrated medical technology company with two main areas of

business activity.  In the field of ophthalmology, CZM offers complete solutions for treating the

four main eye ailments: vision defects to include refractive, cataract, glaucoma and retinal

disorders.  CZM's products support doctors and patients to diagnose and treat these ailments

efficiently and precisely.  For example, CZM's Stratus OCT (Optical Coherence Tomography)

scanner is an industry leader in the field of ophthalmic imaging for ocular diseases.  In the field

of neuro/ENT surgery, CZM is the world's leading provider of surgical microscopes and

visualization solutions for these treatments.

#### William Shields

5.      Upon information and belief, defendant William Shields is an individual with a

residence at 22 Hidden Brick Road, Hopkinton, Massachusetts 01748.  During the majority of

his CZM employment, Mr. Shields operated primarily out of his Hopkinton, MA home when he

was not traveling.  This Court has general and/or specific personal jurisdiction over Mr. Shields

as a Massachusetts domiciliary and because he regularly conducted business in the

Commonwealth of Massachusetts while employed by CZM.

6.      Mr. Shields is CZM's former Sales Director Europe.  On April 13, 2007,

Mr. Shields abruptly resigned from his CZM employment and accepted an almost identical sales

position at one of CZM's main competitors--Optovue.

- 4 -

**Jurisdiction**

7.     This court has subject matter jurisdiction over this action pursuant to G.L. c. 212,

§ 4, in that it is an action for injunctive relief and money damages with a reasonable likelihood of

recovery in excess of $25,000.

**Venue**

8.     Venue in this court is proper based on Mr. Shields' residence in Middlesex

County, Massachusetts and Superior Court Administrative Directive No. 03-1.

**Mr. Shields's Employment with CZM, CZM's Predecessors and the Employee Agreement**

9.     Mr. Shields began his CZM employment on or about December 2, 2004 when he

became CZM's Director of Business Development Europe.

10.     During the majority of his CZM employment, Mr. Shields operated primarily out

of his Hopkinton, MA home when he was not traveling. Mr. Shields was never resident in

CZM's California headquarters.

11.     As Sales Director-Europe, Mr. Shields was the only Sales Director who, along

with five (5) Country Managers, reported to Carl Zeiss Meditec AG's Vice President Sales

EMEA.

12.     Mr. Shields' initial responsibilities included managing CZM's GDx and Visante

OCT product lines along with developing key thought leaders in Europe. When Mr. Shields was

subsequently promoted to the position of Sales Director Europe, his responsibilities expanded to

include the entire ophthalmic diagnostic products line in EMEA.

13.     As a condition precedent to his employment with CZM, Mr. Shields was required

to execute the Employee Agreement. Mr. Shields executed the Employee Agreement on

December 6, 2004, coincident with his beginning employment with CZM.

- 5 -

14.     Pursuant to Paragraph 1 of the Employee Agreement, Mr. Shields agreed to

"devote [his] best efforts to the interests of the Company and [] not engage in other employment

or in any activities detrimental to the best interests of the Company without prior or written

consent of the Company."

15.     The Employee Agreement contains post-employment restrictive covenants.

Paragraph 6 of the Employee Agreement is a non-disclosure clause protecting CZM's

confidential information (the "Non-Disclosure Clause").

16.     The Employee Agreement defines "Confidential Information" as:

> information pertaining to any aspect of the Company's business which is
> information not known by actual or potential competitors of the Company,
> proprietary information of the Company or its customers or suppliers, or
> information designated by the Company as Confidential. Confidential Information
> covered by this Agreement specifically includes, but is not limited to research and
> development activities, requests for proposals, bids, proposals, marketing plans
> and strategies, business plans and strategies, financial statements, profitability
> information, budgets, projections, surveys, client lists, and personnel and payroll
> information.

17.     Pursuant to the Non-Disclosure Clause, Mr. Shields agreed:

> to hold in confidence and not directly or indirectly to use or disclose, either during
> or after termination of my employment with the Company, any Confidential
> Information I obtain or create during the period of my employment, whether or
> not during working hours, except to the extent authorized by the Company, until
> such Confidential Information becomes generally known. I agree not to make
> copies of such Confidential Information except if authorized by the Company.
> Upon Termination of my employment or upon an earlier request of the Company,
> I will return or deliver to the Company all tangible forms of such Confidential
> Information in my possession or control including, but not limited to drawing,
> specifications, documents, records, devices, models or any other material and
> copies or reproduction thereof.

18.     Paragraph 8 of the Employee Agreement is a non-interference clause (the "Non-

Interference Clause"). Pursuant to the Non-Interference Clause, Mr. Shields agreed that during

his CZM employment:

- 6 -

and for a period of two years following the date of termination of my employment with the Company, I will not disrupt, damage, impair or interfere with the business of the Company, whether by way of interfering with or recruiting its employees, disrupting its relationship with customers, agents, representatives, or vendors. Upon termination, I am not, however, restricted from being employed by or engaged in a competitive business.

19.     The Non-Interference Clause is narrowly tailored to protect CZM's legitimate business interests in the ophthalmic market. The Non-Interference Clause precludes Mr. Shields only from "disrupt[ing], damag[ing], impair[ing] or interfer[ing] with the business of the Company" for two years from the date on which Mr. Shields ends his CZM employment.

<u>**Mr. Shields' Access to and Creation of CZM's**</u>
<u>**Trade Secrets and Confidential Information**</u>

20.     Since its inception, CZM has expended significant time and expense developing its confidential, proprietary and trade secret information and products, and in developing and servicing its clients and growing its business. Over time and through these efforts, CZM has been successful in developing and maintaining a significant library of confidential, proprietary and trade secret information, and a stable and profitable customer base.

21.     CZM's Confidential Information includes its confidential, proprietary and trade secret information, including, but not limited to, matters of a business nature such as trade secrets, information about procurement, finances, costs and profits, business plans, marketing and advertising plans and strategies, plans to expand their business, personnel information, records, and/or other confidential or proprietary information belonging to CZM relating to the business and enterprise of CZM. CZM also has developed knowledge of and experience with its customers' operations and needs, and has developed sophisticated customer information such as the key contacts within each customer's business, the volume of the customer's business, specific customer needs, and financial information that is also part of CZM's Confidential Information.

- 7 -

22.    CZM's Confidential Information is not readily available or generally known to CZM's competitors in the industry.  There is no source available to the public to determine this information.

23.    CZM's confidential and proprietary information is secured at considerable time, effort, and expense to CZM.

24.    To safeguard its Confidential Information, CZM limits access to only those employees with a need to know such information and requires all employees with access to sign agreements similar to the Employee Agreement.

25.    As a CZM employee responsible for overseeing sales on three continents, Mr. Shields was privy to CZM's most sensitive business, sales, marketing and strategic plans and information.  For example, he regularly received reports concerning CZM's business analysis, performance to plan analysis, business plan revisions, project reports and updates, departmental reporting, pricing and volume analysis, and profitability analysis per sales in EMEA.  All of this Confidential Information is guarded, secret and confidential.

26.    Mr. Shields was also responsible for creating certain CZM Confidential Information, including, but not limited to the "Early Access Program" described below.

27.    If a competitor like Optovue gained access to such information it would achieve a significant advantage over CZM in the ophthalmic market.

### Mr. Shields is Inextricably Linked to CZM's Goodwill

28.    CZM's Director of Business Development Europe and later as CZM's Sales Director Europe, Mr. Shields was responsible for and played a key role in generating CZM's goodwill.  As part of his responsibilities, Mr. Shields oversaw a budget of approximately $26.6 million.  He was also responsible for strategic and fiscal planning for all of EMEA.

10602282.4

- 8 -

29.   Mr. Shields was responsible for handling most top level relationships with customers in EMEA and identifying key thought leaders throughout EMEA.  As Sales Director Europe, he was involved in the development and implementation of marketing plans and pricing strategies, including setting local pricing strategies, distribution levels, specific distribution targets, and program details.  He worked directly with key thought leaders and had significant knowledge of CZM's strategic and marketing plans with respect to these accounts.

30.   As Sales Director Europe, Mr. Shields had significant, substantial, substantive and repeated contact with CZM's customers and thought leaders throughout EMEA.

31.   As a result of his knowledge of CZM's Confidential Information and his customer contacts, Mr. Shields is in a position to do significant competitive harm to CZM's goodwill and customer relationships as an Optovue employee.  Indeed, since it appears that he will be directing the sales and marketing of products that compete head-to-head with the CZM's products, Mr. Shields cannot help but use CZM's Confidential Information and customer goodwill to do his job for Optovue.

### Mr. Shields Breaches his Duty of Loyalty by Using CZM's Resources to Secure Employment with Optovue.

32.   In March, 2007, Mr. Shields traveled to Europe at CZM's expense for the ostensible purpose of attending a trade show on CZM's behalf and marketing CZM at the trade show.  Upon information and belief, when Mr. Shields traveled to Europe for CZM, he also met with Optovue officials and interviewed for a position with Optovue.

33.   A review of Mr. Shields' CZM-provided laptop located e-mails he sent from his home e-mail address just prior to traveling to Europe containing questions about and salary requirements for an Optovue sales position.  The e-mail also contained an analysis comparing

- 9 -

CZM's budget for its Stratus OCT product with Optovue's budget for its competing RTVue product.

### Mr. Shields has Access to CZM's Confidential European Sales and Marketing Plan for its New Product.

34.    During his tenure at CZM, Mr. Shields was intimately involved in CZM's creation of a European sales and marketing plan for its new product: the Cirrus HD-OCT. The Cirrus HD-OCT is the successor to CZM's Stratus OCT that competes directly with Optovue's primary product, the RTVue.

35.    The European sales and marketing plan, known as the "Early Access Program" or "EAP," is a strategic group of key customers/sites throughout the world through which to seed the new Cirrus HD-OCT by offering special pricing. The list of customers/sites that CZM selected is highly confidential and sensitive, and is comprised of the customers/sites that CZM views as recognized "thought leaders" in the industry.

36.    In late-March 2007, Mr. Shields specifically requested and was provided with a complete copy of the finalized EAP documents. These documents included a complete list of finalized EAP customers, customer objectives, incentive pricing, expected market pricing and roll-out plans.

37.    Disclosure of information concerning the EAP to competitors, especially Optovue, or the public would be tantamount to disclosing CZM's strategy for the near future and would undoubtedly result in severe economic consequences and harm to CZM's business reputation.

### Mr. Shields Gathers CZM's Confidential Information to Take with Him to Optovue.

38.    Between April 4 and 5, 2007, Mr. Shields reviewed certain computer files that appear to contain CZM's Confidential Information. The documents Mr. Shields reviewed have

- 10 -

titles including "Distributor Evaluation," "Final Distributor Master List," International Terms &

Conditions of Sales" and International_contactList." Importantly, all of these files resided on

removable media, e.g., USB drives, CD-ROMs and floppy disks, that were connected to

Mr. Shields' CZM-provided laptop when he reviewed the files. Mr. Shields also connected an

external hard drive to his laptop between April 4, 2007 and April 6, 2007.

      39.     Upon information and belief, Mr. Shields gathered this information to provide to

Optovue and to rely upon in his new position at Optovue.

**Mr. Shields Sends CZM's Confidential Information to Optovue.**

      40.     On April 4, 2007, John Edwards, CZM's Regional Sales Manager - Texas, sent

certain CZM sales personnel, including Mr. Shields, a confidential report concerning a customer

who purchased a product from Optovue and the problems he had with the product ("Edwards E-

Mail"). The customer subsequently returned the Optovue product and purchased CZM's

competing product.

      41.     The insights of this customer and problems he reported were extremely valuable

as they provided CZM with strategic marketing strategies to use in competition with Optovue.

Adding to the importance and value of this information was the fact that Optovue was unaware

of its existence and therefore unable to create fixes and/or responses to the specific reported

problems.

      42.     Evidence from the review of Mr. Shields' CZM-provided laptop and CZM's

servers show that the very next day, April 5, 2007, Mr. Shields, while still employed by CZM,

forwarded the Edwards E-Mail and the attached report to Jay Wei and Paul Kealey at Optovue.

Messrs. Wei and Kealey are Optovue's respective Founder & President/CEO and Vice President

of Sales/Marketing. Mr. Shields also copied the document attached to the Edwards E-Mail onto

an external hard drive.

- 11 -

43.    CZM's computer servers also show that Mr. Wei wrote back to Mr. Shields and
Mr. Kealey twice responded, all within approximately nine hours of Mr. Shields' original e-mail.
While the computer records do not contain the precise content of these e-mails, there is no
legitimate reason why Mr. Shields should have been communicating with Messrs. Wei and
Kealey within two weeks of his departure.

44.    Mr. Shields attempted to cover-up the fact that he forwarded Mr. Edwards' e-mail
and attachment to Optovue and received e-mails from Messrs. Wei and Kealey by deleting the
messages from his laptop.

## Mr. Shields Resigns from CZM, Fails to Return CZM's Confidential Information and Begins Working for Optovue in a Similar Capacity

45.    On April 13, 2007, Mr. Shields abruptly resigned from his position at CZM.

46.    Upon leaving CZM, Mr. Shields returned his CZM-provided laptop computer but,
in an obvious attempt to hide his transfer of CZM's Confidential Information and
correspondence with Messrs, Wei and Kealey, deleted any record of such transmissions.

47.    Mr. Shields also did not return to CZM upon his departure any removable media,
including the external hard drive, containing the CZM files he accessed between April 3, 2007
and April 5, 2007.

48.    Upon leaving CZM, Mr. Shields signed a Termination Certification, a true and
accurate copy of which is attached as Exhibit B.  The Termination Certification provides in part
that:

> I hereby certify that I do not have in my possession or control, nor have I failed to
> return any confidential information belonging to Carl Zeiss Meditec.  This
> includes, but is not limited to, specifications, drawings, reproductions, sketches,
> notes, reports, proposals, records, devices, models, software, data files, or
> copies/reproductions, or other documents or materials, tools, equipment or any
> other property belonging to Carl Zeiss Meditec Inc.

- 12 -

49.    According to Optovue's website, Mr. Shields is now employed by Optovue as its Vice President of International Sales. This position appears to be almost identical to the one Mr. Shields held at CZM. This similarity makes it inevitable that Mr. Shields has relied upon and/or will rely upon CZM's Confidential Information in the performance of his Optovue duties.

**COUNT I**
**BREACH OF CONTRACT: Breach of Non-Disclosure Clause**
**and Termination Certification**

50.    CZM repeats and makes a part hereof each and every averment set forth in paragraphs 1 through 49 of the Verified Complaint.

51.    Between April 3, 2007 and April 5, 2007, Mr. Shields reviewed certain computer files that appear to contain CZM Confidential Information. These files resided on removable media that he failed to return to CZM upon his departure.

52.    On April 5, 2007, Mr. Shields forwarded CZM's Confidential Information (Edwards E-Mail) to Optovue and then attempted to delete evidence of his having done so.

53.    Such gathering and disclosing of CZM's Confidential Information constitutes misappropriation and improper use of CZM's Confidential Information in breach of the Non-Disclosure Clause.

54.    Contrary to his certification in the Termination Certification, Mr. Shields has in his possession or control CZM Confidential Information, including, but not limited to, an external hard drive that he connected to his CZM-provided laptop and accessed between April 5, 2007 and April 6, 2007 that contains a copy of the file attached to the Edwards E-Mail.

55.    Upon information and belief, Optovue solicited and hired Mr. Shields in order to benefit from the Confidential Information Mr. Shields acquired during his tenure with CZM.

56.    Mr. Shields has relied upon and/or will inevitably rely upon CZM's Confidential Information in the performance of his duties for Optovue.

- 13 -

57.    Mr. Shields's breach of the Non-Disclosure Clause has damaged CZM, will continue to damage CZM and is causing CZM immediate and irreparable harm.

58.    CZM has no adequate remedy at law.

## COUNT II
## BREACH OF FIDUCIARY DUTY

59.    CZM repeats and makes a part hereof each and every averment set forth in paragraphs 1 through 58 of the Verified Complaint.

60.    Mr. Shields has a continuing, common law, fiduciary obligation to CZM not to use or disclose the company's Confidential Information in competition with CZM following the resignation of his employment.

61.    As averred above, Mr. Shields use and/or disclosure of CZM's Confidential Information on behalf of a competitor constitutes a breach of his continuing fiduciary duty to CZM.

62.    If Mr. Shields is permitted to work for Optovue, Mr. Shields will disclose to Optovue CZM's Confidential Information in breach of his fiduciary duty to CZM. Such disclosure will result in irreparable harm to CZM and will unfairly benefit Optovue.

63.    Such breach of fiduciary duty has caused or threatens to cause CZM irreparable harm, for which CZM has no adequate remedy at law.

## COUNT III
## BREACH OF CONTRACT:  Breach Of Non-Interference Clause

64.    CZM repeats and makes a part hereof each and every averment set forth in paragraphs 1 through 63 of the Verified Complaint.

65.    Optovue manufactures and sells products that compete directly with CZM products in the ophthalmic market.

10602282.4

- 14 -

66.     Upon information and belief, Optovue solicited and hired Mr. Shields to obtain, among other things, the benefit of CZM's customer contacts.

67.     Upon information and belief, Mr. Shields is impermissibly interfering with CZM's business by disrupting CZM's relationship with its customers. This is a breach of the Non-Interference Clause.

68.     Mr. Shields has breached and/or inevitably will breach the Non-Interference Clause by accepting the position of Vice President of International Sales with Optovue.

69.     The Non-Interference Clause is enforceable to protect CZM's legitimate business interests, including its legitimate interests in protecting its Confidential Information and its customer goodwill.

70.     Mr. Shields' breach of the Non-Interference Clause has damaged CZM and CZM is suffering immediate and irreparable harm in that its Confidential Information is being by a direct competitor and CZM will be deprived of the business, goodwill and continuing relationships of its customers.

71.     CZM has no adequate remedy at law.

**COUNT IV**
**UNFAIR COMPETITION**

72.     CZM repeats and makes a part hereof each and every averment set forth in paragraphs 1 through 71 of the Verified Complaint.

73.     By the foregoing acts, Mr. Shields has engaged in unfair competition.

74.     As a result of Mr. Shields' unfair competition, CZM has been damaged and CZM is suffering immediate and irreparable harm in that it is being deprived of its business, goodwill and continuing relationships of its customers, and its Confidential Information is being used against it.

10602282.4

75.    CZM has no adequate remedy at law.

## COUNT V
## DECLARATORY RELIEF

76.    CZM repeats and makes a part hereof each and every averment set forth in paragraphs 1 through 75 of the Verified Complaint.

77.    There is an actual and genuine controversy between the parties as to whether Mr. Shields' employment by Optovue in a sales capacity with responsibility for EMEA is a violation of the Employee Agreement and/or his fiduciary duty to CZM.

78.    CZM requests a declaration from this court that Mr. Shields' employment by Optovue in a sales capacity with responsibility for EMEA is a violation of the Employee Agreement and/or his fiduciary duty to CZM, that must be enjoined.

WHEREFORE, CZM respectfully requests that the Court:

1.    Enter a preliminary and permanent injunction restraining and enjoining Mr. Shields from working for Optovue in a sales capacity until April 13, 2009 (the "Period").

2.    Enter a preliminary and permanent injunction restraining and enjoining Mr. Shields from disclosing to Optovue or to any other person CZM's Confidential Information.

3.    Enter a preliminary and permanent injunction restraining and enjoining Mr. Shields and any person or entity to whom Mr. Shields has provided CZM's Confidential Information from relying upon or otherwise using CZM's Confidential Information.

4.    Enter a preliminary and permanent injunction compelling Mr. Shields to immediately return to CZM all CZM Confidential Information, including any removable media devices upon which such information is stored.

5.    Declare that Mr. Shields' employment by Optovue to perform the Services is a violation of the Employee Agreement and/or his fiduciary duty to CZM, that must be enjoined.

- 16 -

6.    Enter judgment in favor of CZM for damages, in an amount to be determined at trial, on Counts I through V of this Verified Complaint.

7.    Enter judgment in favor of CZM for costs, attorneys' fees and such other relief as the court deems just and appropriate.

> CARL ZEISS MEDITEC, INC.
>
> By its attorneys,
>
> Gregg A. Rubenstein (BBO #639680)
> NIXON PEABODY LLP
> 100 Summer Street
> Boston, MA  02110
> Tel. (617) 345-1000
> Fax (617) 345-1300
>
> *Of Counsel*:
>
> Bruce E. Copeland, CA Bar No. 124888
> NIXON PEABODY LLP
> One Embarcadero Center, 18th Floor
> San Francisco, CA 94111
> Tel. (415) 984-8200
> Fax (415) 984-8300

Date:  June 7, 2007

10602282.4

<u>VERIFICATION</u>

I, Joseph Donahoe, Executive Vice President Americas of Carl Zeiss Meditec, Inc., hereby state that I have read the foregoing Verified Complaint and am familiar with the contents thereof, and that the facts set forth therein are true by my own personal knowledge and/or in accordance with the business records of the company, except those facts set forth on information and belief, and that as to those allegations, I believe them to be true.

I declare under penalty of perjury that the foregoing statements are true and correct. This the 6th day of June 2007.

_____
Joseph Donahoe

10602282.4

# Exhibit A

 CARL ZEISS MEDITEC

## EMPLOYEE AGREEMENT

In exchange for my becoming employed by Carl Zeiss Meditec Inc. or its parent company, subsidiaries, affiliates or successors (hereinafter referred collectively as the "Company"), I hereby agree as follows:

1. **Basic Obligations of Employee.** I will perform for the Company such duties as may be designated by the Company from time to time. During my period of employment by the Company, I will devote my best efforts to the interests of the Company and will not engage in other employment or in any activities detrimental to the best interests of the Company without prior or written consent of the Company.

2. **Definitions of "Invention".** As used in this Agreement, the term "Invention" includes designs, discoveries, formulas, processes, manufacturing techniques, trade secrets, inventions (whether they can be patented or not), improvements, ideas or works that can be copyrighted, including all rights to obtain, register, perfect and enforce these proprietary interests.

3. **Definition of "Confidential Information".** As used in this agreement, the term "Confidential Information" means information pertaining to any aspect of the Company's business which is information not known by actual or potential competitors of the Company, proprietary information of the Company or its customers or suppliers, or information designated by the Company as Confidential. Confidential Information covered by this Agreement specifically includes, but is not limited to research and development activities, requests for proposals, bids, proposals, marketing plans and strategies, business plans and strategies, financial statements, profitability information, budgets, projections, surveys, client lists, and personnel and payroll information.

4. **Assignment of Inventions.** I agree that, with the exception of inventions excluded by California Labor Code section 2870, any and all inventions which I may solely or jointly conceive, develop or reduce to practice during the period of my employment with the Company: (a) which pertain to any line or actual business activity or demonstrably anticipated research or development of the Company; (b) which conception, development or practice are aided by the use of time, materials, facilities or the confidential information of the Company, whether or not during working hours; or (c) which inventions relate to any of the work during the period of my employment with the Company, whether or not during normal working hours, belong to Company. I promise, without further compensation, to assign to the Company my entire right, title and interest to said inventions.

   I further agree, any works that can be copyrighted that I develop and are usable in the Company's business are works made for hire and belong to the Company. If for any reason any work that can be copyrighted is not considered as works made for hire, I promise, without further compensation, to assign to the Company my entire right, title and interest in and to said copyrights.

5. **Perfection of the Company's Title in Inventions.** I agree to execute all documents requested by the Company regarding the filing and prosecution of all applications for patents and inventor's certificates, enforcement of all patents, and maintenance of all rights in the inventions, patents, inventor's certificates and applications for patents or inventor's certificates based on the inventions.

   In addition, upon request of the Company, and at its expense, regarding the filing and prosecution of all applications for patents and inventor's certificates, enforcement of all patents and maintenance of all rights in the inventions, patents and inventor's certificates and application for patents or inventor's certificates based on the inventions, I agree to provide the Company all information known to or ascertainable by me and all documents and other materials and objects pertaining to the Company's rights in the inventions that are in the possession of or accessible to me, and further, at any trial hearing, deposition, or other legal proceeding where I am called as a witness by the Company, I agree to testify to all facts pertaining to the Company's rights in the inventions for which I am competent to testify.

6. **Nondisclosure of Confidential Information.** I agree to hold in confidence and not directly or indirectly to use or disclose, either during or after termination of my employment with the Company, any Confidential Information I obtain or create during the period of my employment, whether or not during working hours, except to the extent authorized by the Company, until such Confidential Information becomes generally known. I agree not to make copies of such Confidential Information except if authorized by the Company. Upon Termination of

my employment or upon an earlier request of the Company, I will return or deliver to the Company all tangible forms of such Confidential Information in my possession or control including, but not limited to drawing, specifications, documents, records, devices, models or any other material and copies or reproduction thereof.

7. **Cooperation.** I agree that for a period of one year, (365 days) following the termination of my employment, I will cooperate with the Company in maintaining customer relations with any and all customers with whom I had contact during the course of my employment with the Company.

8. **Non-Interference.** During my employment and for a period of two years following the date of termination of my employment with the Company, I will not disrupt, damage, impair or interfere with the business of the Company, whether by way of interfering with or recruiting its employees, disrupting its relationship with customers, agents, representatives, or vendors. Upon termination, I am not, however, restricted from being employed by or engaged in a competitive business.

9. **Performance of This Agreement Not a Breach of Any Other Agreement.** I represent that my performance of all the terms of this Agreement and as an employee of the Company does not and will not breach any agreement to keep in confidence proprietary information knowledge or data acquired by me in confidence or in trust prior to my employment with the Company, and I will not disclose to the Company, or induce the Company to use, any confidential or proprietary information or lateral belonging to any previous employer or others. I agree I will not enter into any agreement either written or oral in conflict with the provisions of this Agreement.

10. **Scope of the Agreement.** This Agreement shall survive my employment by the Company. However, this Agreement does not, in any way restrict the right of the Company to terminate my employment at any time with or without cause and with or without notice at the Company's sole discretion. This Agreement is transferable to the benefit of successors and assigns of the Company; and is binding upon all heirs and legal representatives.

11. **Other Agreements.** I certify that, to the best of my information and belief, I am not a party to any other agreement that will interfere with my full compliance with the Agreement.

12. **Termination Certification.** I agree upon termination of employment with the Company to reaffirm my obligations set forth above, including signing the "Termination Certification" provided to me by the Company. A copy of the current Termination Certification is attached.

13. **Severance of Agreement Terms or Provisions.** In the event that any of the terms or provisions of this Agreement shall violate any statutory provision or may be otherwise unlawful or inoperative, it is the intent and desire of the parties that the Agreement operate and be in full force and effect insofar as it does not violate the statutory provisions or is otherwise lawful and that this Agreement be carried out as far as possible and is consistent with its tenor and effect.

14. **Section Headings.** The section headings contained herein are for reference purposes only and in no way will any of them affect the meaning and interpretation of this Agreement.

15. **No Employment Contract.** This Agreement does not constitute an employment contract between the parties, nor does it recognize any obligation or promise of continued employment.

I certify and acknowledge that I have carefully read all of the provisions of this Agreement and that I understand and will fully comply with such provisions. I have completed "Attachment I" to list any inventions, if any, I solely or jointly conceived, developed or reduced to practice prior to the period of my employment with the Company.

**EMPLOYEE**                                    **CARL ZEISS MEDITEC INC.**

_____                     _____
Employee Signature                              Signature

William T. Shields                              MARCO ROSA
Print Name                                      Print Name

12/6/04                                         VP HR            12-7-04
Date                                            Title            Date

**Exhibit B**

 CARL ZEISS MEDITEC

# TERMINATION CERTIFICATION

I hereby certify that I do not have in my possession or control, nor have I failed to return, any confidential information belonging to Carl Zeiss Meditec Inc. This includes, but is not limited to, specifications, drawings, reproductions, sketches, notes, reports, proposals, records, devices, models, software, data files, or copies/reproductions, or other documents or materials, tools, equipment or any other property belonging to Carl Zeiss Meditec Inc.

I further certify that I have complied with and will continue to comply with all of the terms of the Employee Agreement signed by me with Carl Zeiss Meditec Inc., including the reporting of any inventions conceived, developed or reduced to practice, or made by me which are covered by the Agreement.

I further agree that in compliance with the Employment Agreement, I will preserve as confidential all proprietary, technical, and business information pertaining to Carl Zeiss Meditec Inc.

_____
Employee Signature

Date 4|12|07

William T. Shields
Employee printed name

Date 4|12|07